# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-199 (RDM)** |
| **JOSHUA LEE ATWOOD** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua Lee Atwood to 63 months' imprisonment (the top of the applicable Guidelines range), 3 years' supervised release, agreed-to $2,000 in restitution, and a $100 special assessment.

## I.    INTRODUCTION

The defendant, Joshua Atwood, assaulted police officers during the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

On January 6 between approximately 4:50 p.m. and 5:03 p.m., Atwood used a veritable arsenal of weapons to commit multiple violent assaults against the line of police officers guarding the Lower West Terrace "Tunnel." He threw various objects at the police, including a metal bat, a metal pole, a thick metal pipe apparently torn from the inaugural stage's scaffolding, and a speaker cabinet. He beat officers with a long, thick wooden pole and a riot shield. And he sprayed a can of pepper spray into the police line until it was empty. Atwood's attacks on police only halted when reinforcing law enforcement officers arrived to assist MPD officers and were finally able to successfully push rioters off of the Lower West Terrace.

The government recommends that the Court sentence Atwood to 63 months of incarceration for his conviction of violating 18 U.S.C. 111(a)(1) and (b)—a recommendation at the top of the applicable Guidelines range. A 63-month sentence reflects the immense gravity of Atwood's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 21, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Joshua Atwood's Role in the January 6, 2021 Attack on the Capitol

#### *Atwood's Breach of the Capitol Grounds and Building*

On or about January 6, 2021, Joshua Atwood travelled from his home in Burgettstown, Pennsylvania, to Washington, D.C., to attend the "Stop the Steal" rally. He wore a dark jacket, dark gloves, and a blue/gray backpack. Image 1 (depicting Atwood's appearance while present on Capitol grounds).



*Image 1*

After the rally, Atwood approached the Capitol. As he reached the Capitol grounds, Atwood encountered a large crowd assembled on restricted grounds surrounding the building. Nevertheless, Atwood entered these restricted grounds from the west side of the Capitol and eventually made his way to the inaugural stage. *See* Images 2 (depicting Atwood standing on the Peace Circle Monument) and 3 (depicting Atwood on the inaugural stage's northwest scaffolding).




*Image 2*                              *Image 3*

By approximately 4:30 p.m., Atwood made his way onto the inaugural stage itself, just by the Lower West Terrace Tunnel. Around approximately 4:36 p.m., Atwood entered the Capitol

building through a broken window situated next to the Tunnel entrance. The window led into Senate Terrace Room 2, which had been swarmed and essentially demolished by rioters. After leaving back through the broken window sometime later, Atwood lingered on the ledge outside the window. *See* Images 4 (depicting Atwood inside Senate Terrace Room 2) and 1, above (depicting Atwood outside the broken window).



*Image 4*

***Atwood's Assaults on Police Officers Guarding the Tunnel***

Between roughly 4:50 p.m. and 5:03 p.m., Atwood made his way to the front line of rioters and participated in the mob's last efforts to breach the Tunnel. At this point, police had been fighting rioters in and around the Tunnel for over two hours.

At approximately 4:51 p.m., Atwood picked up a bottle from the ground and threw it at police huddled together to block the Tunnel's entryway. *See* Image 5; Exhibit 1.[2] The bottle flew into the Tunnel and struck an officer. Exhibit 2.

---

[2] The government's sentencing exhibit videos will be provided separately to the Court and defense counsel.



*Image 5* (Atwood in yellow; bottle in red)

After throwing the bottle, Atwood hurled a long metal pole like a spear at the police officers. Image 6; Exhibit 1. The metal pole ricocheted off the Tunnel's south wall and struck a nearby officer. Exhibit 2.



*Image 6*

Atwood then threw several handfuls of small items at the officers in the Tunnel. *See* Images 7 (depicting Atwood throwing a handful of items) and 8 (depicting Atwood throwing a bottle); Exhibit 1.



*Image 7* (Atwood in yellow; items in red)



*Image 8* (Atwood in yellow; bottle in red)

Next—as the crowd loudly chanted, "TRAITORS! TRAITORS!"—Atwood picked up a long, thick, wooden pole. Wielding the pole overhead like a spear, Atwood stabbed at and struck multiple police officers. *See* Image 9; Exhibit 3. Specifically, Atwood struck two MPD officers at the front of the police line who were using their riot shields to block Atwood's repeated strikes,

pulled the pole back and used a stabbing motion to strike another MPD officer in the helmet, and then threw the pole at two MPD officers' riot shields. Exhibit 4.



*Image 9*

At approximately 4:56 p.m., Atwood drew a cannister of pepper spray and began spraying the front line of police officers at the Tunnel entrance. Image 10; Exhibit 8. Atwood sprayed the cannister continuously until the cannister was depleted. Once the cannister was empty, Atwood threw it at the police. Image 11; Exhibit 8.



*Image 10* (Atwood at left; spraying cannister at right)



*Image 11* (Atwood at left; thrown cannister at right)

About a minute later, Atwood threw a yellow fabric object and a liquor bottle at the police.

*See* Image 12 (depicting Atwood throwing liquor bottle).



*Image 12* (Atwood at left, in yellow; bottle at right, in red)

Around approximately 5:00 p.m., Atwood poured water on his face to clear his eyes of chemical sprays and other residues that accumulated as he attacked the police. Image 13. Exhibit 9.



*Image 13*

About one minute later, Atwood picked up a riot shield that had been taken from the police and a metal baseball bat. Atwood threw the metal bat at the officers in the Tunnel. Image 14; Exhibit 9. The bat struck officers' riot shields.



*Image 14* (Atwood indicated at left; thrown bat indicated at right)

After throwing the metal bat, Atwood used the riot shield to repeatedly scrape and beat the against the ground—first, in an apparent attempt to regain possession of the metal bat, then, in an effort to intimidate the police. Exhibit 9.

By approximately 5:02 p.m., Atwood started using the riot shield he was holding to repeatedly strike police officers' own shields. Images 15 and 16; Exhibits 5 and 6. As he used his riot shield to batter the front line of officers, Atwood shouted several statements at them:

- "Fuck off, you guys are all pieces of shit."
- "Every one of you should be ashamed of yourself. Every one of you mother fuckers are pieces of shit. Betraying your country like this, why would you betray your county. Do you love our country, or do you want civil… communist fuck."
- ". . . pieces of fucking shit. Every one of you motherfuckers."

Exhibits 6 and 7.


*Image 15*


*Image 16*

Moments later, Atwood discarded the shield and lifted up a thick, heavy, metal pipe, which appeared to be a piece of scaffolding broken-off from the inaugural stage construction. Exhibits 5, 7, and 10. Atwood hurled the pipe into the crowd of officers, and the pipe struck an officer's riot shield before hitting a Virginia State Police trooper's head and neck. *See* Images 17 (depicting Atwood beginning to throw the pipe) and 18 (depicting the pipe striking the VSP trooper); Exhibits 7 and 10.



*Image 17*



*Image 18*

After throwing the pipe, Atwood picked up a large, black speaker cabinet and similarly hurled it into the police officers. Image 19; Exhibits 7 and 10.



*Image 19*

Approximately two minutes later, the now-reinforced police in the Tunnel began deploying larger crowd-control munitions on the inaugural stage and began an effort that would eventually successfully push the mob off the Lower West Terrace. By approximately 5:12 p.m., Atwood fled the inaugural stage during this effort as police pushed further out from the Tunnel area and continued to deploy additional crowd-control munitions. *See* Image 20.



*Image 20*

***Data Extracted from Atwood's Cell Phone Dated Just Prior to His Arrest***

In early April 2024, approximately one week prior to Atwood's arrest, an article was published online that specifically named Atwood as a subject in the Capitol Riot investigation.[3] The article notes that "Atwood could not be reached for comment on this story." Atwood also appears to have been publicly named as a Capitol Riot subject by individuals on social media since at least September 2023.

Data extracted from Atwood's cell phone, which he purchased in early April 2024 and set up under a fake name, suggests that in the days leading up to his arrest Atwood was aware he had been publicly identified and was considering fleeing or taking other precautions to evade detection by the authorities. Between April 7 and April 8, 2024,[4] Atwood exchanged the following messages with his spouse, which were deleted from Atwood's phone but nevertheless recovered during the data extraction:

- "I could probably load up the whole house in a u haul in a few hours"
- "When ever someone calls the biz phone don't let them say a time or place and tell them you'll call them back then *67 them and call them back in private so they don't have ur new number and then the other phones don't give up the key info time and place!"
- "Delete all our text and calls and go into the section and delete the deleted lol"

---

[3] *See* https://www.rawstory.com/raw-investigates/sedition-hunters-january-6-arrests/.

[4] Atwood was arrested in connection with this case on April 17, 2024.

Additionally, Atwood's search history included the following:

- "jordan minks release date"[5]
- "how do new[s] reporters know about crimes"
- "how to get a place with out identification"
- "washington county pa serifs warrant search"
- "how can u tell if you wanted"
- "when a hotel takes your info is it public or private"
- "joshua atwood burgettstown pa"
- "fbi most wanted list 2023"
- "wanted people in Pittsburgh"
- "best place to be homeless"
- "where to go to live if your illegal in pittsburgh pa"
- "best place to sleep without id in pittsburgh"

## III.    THE CHARGES AND PLEA AGREEMENT

On April 24, 2024, a federal grand jury returned an indictment charging Atwood with nine

counts, including 18 U.S.C. § 111(a)(1) and (b). On September 5, 2024, Atwood was convicted of

one count of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Atwood now faces sentencing on one count of violating 18 U.S.C. §§ 111(a)(1) and (b).

As noted by the plea agreement and the Presentence Report ("PSR")[6] issued by the U.S.

Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release

---

[5] Capitol riot defendant Jorden Mink was sentenced by this Court on June 2, 2023, to 51 months imprisonment following his guilty pleas to violating 18 U.S.C. § 641 and §§ 111(a)(1) and (b). ECF No. 99 at 2, *United States v. Mink*, 21-cr-25 (RDM). Mink is from the same area in Pennsylvania as Atwood and is visible with Atwood on several occasions in video and images from the Capitol. Atwood and Mink were captured on video and images present together outside the Capitol, committing their respective assaults in close proximity to one another, and were captured on video together leaving the Capitol in the evening.

As this Court is aware, Mink used a metal baseball bat—which appears to be the same metal bat Atwood later threw at police—to break open the window to the Mezzanine that Atwood used to enter the Capitol. In the same area as Atwood, Mink likewise assaulted police officers at the Lower West Terrace Tunnel: he spat on them, threw items at them, and repeatedly struck them with a flagpole. *See* ECF No. 86 at 2, *United States v. Mink*, 21-cr-25 (RDM).

[6] As of the filing of this memorandum, only the draft Presentence Report is available, ECF No. 23.

of not more than five years, a fine up to $250,000 or twice the pecuniary gain of loss of the offense, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR agrees with the Guidelines calculation contained in the parties' Plea Agreement:

Count Two: 18 U.S.C. § 111(a)(1) and (b)

| U.S.S.G. § 2A2.2 | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | 111(b) conviction | | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **26** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | | -3 |
| **Total Adjusted Offense Level:** | | | **23** |

*See* Plea Agreement ¶ 5(A); PSR ¶¶ 43–51.

The U.S. Probation Office calculated the defendant's criminal history as category II, which is anticipated by the Plea Agreement. PSR ¶ 61; Plea Agreement ¶ 5(B). However, while both the Plea Agreement and PSR contemplate a criminal history point being assigned to Mr. Atwood's 2011 Disorderly Conduct sentence in Franklin Indiana, Plea Agreement ¶ 5(B); PSR ¶ 58, the Plea Agreement anticipated a point being attributable to Atwood's 2021 Disorderly Conduct sentence in Hanover Pennsylvania, while the PSR instead assigns a criminal history point to Atwood's 2012 Reckless Endangerment sentence in Washington County, Pennsylvania. PSR ¶¶ 59, 60. According to the PSR, a criminal history point should be assigned to the 2012 sentence pursuant to U.S.S.G § 4A1.1(c), and no criminal history point should be assigned to the 2021 sentence because only a fine was imposed. As contemplated by the Plea Agreement, a criminal history point should be assigned to Mr. Atwood's 2021 sentence because it "was similar to an instant offense." U.S.S.G.

§ 4A1.2(c)(1)(B). As described below in Section VI(B) of this memorandum, Atwood's disorderly conduct underlying the 2021 sentence was committed in defiance of the authority of police officers, which is "similar to [the] instant offense." *Id.*; *cf. United States v. Washington*, 103 F.4th 917, 922 (2d Cir. 2024) ("courts comparing prior and instant offenses may consider 'any . . . relevant factor, including the actual conduct involved.'" (citation omitted)).

But regardless of whether Atwood's prior offenses amount to 2 or 3 criminal history points, he would still fall under Criminal History category II. Therefore, based on the calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 23, Atwood's Guidelines imprisonment range is 51 months to 63 months imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the § 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Atwood's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

Atwood helped lead the mob's last efforts to fight at the Tunnel as the five o'clock hour approached—the site and timing of perhaps the most vicious battle at the Capitol on January 6. As he fought on the mob's front line, Atwood relentlessly attacked the police with any object within his reach that could be used as a weapon—from a piece of fabric to a metal baseball bat. As he beat the officers in the police line, Atwood called them "pieces of shit" and taunted that they were "betraying [their] country." His efforts were motivated by an animus towards the proceedings that were supposed to be happening inside the Capitol building: it is no coincidence that the officers

fending off Atwood's and others' attacks were defending the very building where an important democratic process was to be completed. That Atwood's acts did not directly cause any grave injury is nothing short of a miracle and a testament to the officers' training and resilience.

Additionally, the extent of Atwood's coordination with other rioters during his attacks at the Tunnel is extremely troubling. Atwood and others at the front of the mob repeatedly armed each other with various weapons during their numerous assaults on police officers—with the calculated intent that each attack would be escalated or at least equally severe.

Indeed, Atwood developed a habit of utilizing increasingly dangerous and deadly weapons in his repeated assaults on officers. To attack these officers, Atwood first used a plastic bottle. He escalated to a metal pole, then to a long wooden pole. Then he escalated again to pepper spray, and then a riot shield. Next he attacked with a thick, heavy, metal pipe, then, finally, a large speaker cabinet. Atwood's willingness to commandeer an escalating arsenal of dangerous tools in the rioters' battle with officers represents an equivalently escalating disregard for the officers' personal safety. Some of Atwood's assaults involved blows to officers' heads. And some of Atwood's assaults involved throwing weapons over the front-line officers into the less-protected officers further back in the police line.

Moreover, Atwood's attacks were made in spite of the fact he had already entered the Capitol. As the pictures of Atwood inside the Senate Terrace Room show, Atwood made it inside the Capitol building by joining rioters that had broken the windows of that room and climbed inside from the inaugural stage. But entering a broken window and joining rioters inside the breached Capitol building was not enough for Atwood, and his violent assaults on police began within less than 15 minutes of his time inside the building.

The nature and circumstances of Atwood's offense were of the utmost seriousness and fully support the government's recommended sentence of 63 months' imprisonment.

### B.  The History and Characteristics of the Defendant

Atwood lives in Burgettstown Pennsylvania with his fiancé and three young children. For the PSR, Atwood reported a difficult childhood in which he was raised by a parent that struggled with addiction, endured physical abuse, and at one point was placed in foster care. Atwood reported suffering from several medical issues, but Probation had yet to receive corroborating records as of the filing of the draft PSR.[7] Prior to his arrest in this case, Atwood operated his own business and is trained in heating and air conditioning, as well as electrical work and plumbing. PSR ¶¶ 85, 87.

This case is not Atwood's first encounter with the criminal justice system. Atwood has juvenile and adult criminal histories that include prior allegations of assault, including with weapons, and disorderly conduct in defiance of police authority. Furthermore, Atwood has another matter pending in West Virginia, in which it is alleged he committed robbery and malicious assault.

In October 2010, Atwood was arrested for disorderly conduct in Franklin, Indiana. He was convicted of that charge in 2011 and sentenced to 30 days in jail. According to Probation, Atwood joined two other men that struck one victim and kicked down the door of a witness' neighbor. PSR ¶ 58.

In June 2011, Atwood was arrested for two counts of recklessly endangering another person, two counts of aggravated assault, terroristic threats, and two counts of simple assault in McDonald, Pennsylvania. Atwood ultimately pled guilty in 2012 and was convicted of recklessly endangering another person and sentenced to 24 months' probation. PSR ¶ 59. According to McDonald Police Department records, when repossession men knocked on Atwood's door regarding a motorcycle, Atwood answered the door, went back inside the residence, then returned

---

[7] The government understands that the defense provided a letter to Probation from Atwood's doctor confirming "head injuries" since 2022 and "concussion like symptoms."

and exited the residence with a gun. Atwood shot the ground, then pointed the gun at one of the repossession men.

In 2021, just one month after committing his criminal conduct on January 6, Atwood was arrested, plead guilty to, and was sentenced to fines and costs for disorderly conduct in Hanover, Pennsylvania. According to Hanover Township Police Department records, Atwood was involved in an altercation with an officer during a traffic accident investigation. The investigating officer noticed a strong smell of marijuana emanating from Atwood's vehicle, and Atwood claimed he did not know what marijuana smells like. Atwood proceeded to berate law enforcement as they attempted to relocate the involved vehicles and claimed officers were just "following orders like the Jews did when they entered concentration camps[,]" which prompted an argument between Atwood and a tow truck operator, who was Jewish. An officer was forced to break up the conflict. Police later secured a search warrant for the vehicle and discovered marijuana and a glass pipe.

As noted above, Atwood has a pending felony case in Chester, West Virginia. According to Chester Police Department records, on April 28, 2023, Atwood and a male victim working at a restaurant in Chester got into an argument. During the argument, Atwood grabbed a handful of cash bills out of the register, then attempted to leave with the money. When the victim attempted to stop Atwood, the two men got into a fight, during which Atwood dropped a concealed handgun. Atwood pulled out a concealed knife and stabbed the victim. Atwood then retrieved his dropped handgun and fled from the restaurant.

In connection with the Chester incident, law enforcement checked Atwood's address on record, but it appeared that no one was residing at that address. It took law enforcement several weeks to ultimately locate Atwood at a different address, and the effort required the assistance of the U.S. Marshals Service Fugitive Task Force.

When Atwood was arrested in this case, he was eventually located —not at his residence of record—but a different residence that law enforcement first became aware of during his 2023 arrest. During a search of this residence, law enforcement discovered marijuana, drug paraphernalia, and alcohol on the premises. The search also revealed multiple firearms on the premises, including an unregistered rifle.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Atwood's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

For one, Atwood's history is rife with disruptive and assaultive behavior. Additionally, the circumstances of Atwood's arrest and the information extracted from his phone strongly suggest that Atwood's initial thought when he learned he was a criminal target was to flee. Moreover, it is particularly concerning that the highly publicized nature of the crimes at the Capitol committed on

---

[8]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

January 6, 2021, and their resulting prosecutions, did not prevent Atwood from engaging in disorderly conduct one month after the riot. It is also concerning that both events did not apparently prevent Atwood from allegedly stabbing and robbing a restaurant worker just last year.

In any event, that Atwood chose to break the law so blatantly on January 6—while in full view of law enforcement officers and a host of cameras—shows that Atwood is unwilling to adhere to lawful authority, which heightens the specific deterrence concerns.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the § 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Robert Palmer*, 21-cr-328 (TSC), Palmer pled guilty to a violation of 18 U.S.C. § 111(a)(1) and (b). Like Atwood, Palmer threw various objects at officers defending the Tunnel. Palmer also deployed a fire extinguisher at the police line. Palmer lost his acceptance of responsibility points at sentencing due to comments he made on social media, but—unlike Atwood—Palmer did not have a criminal history. Judge Chutkan sentenced Palmer to 63 months' incarceration.

In *United States v. Mark Ponder*, 21-cr-259 (TSC), Ponder also pled guilty to a violation of 18 U.S.C. § 111(a)(1) and (b). Like Atwood, Ponder committed multiple assaults with weapons, though Ponder employed a much smaller arsenal of weapons during his assaults. Ponder, unlike Atwood, was involved in clashes with police in multiple locations and was detained by police at one point. However, Ponder's assaults were not as vicious as Atwood's attacks in the waning hours of the battle at the Tunnel. Judge Chutkan sentenced Ponder to 63 months' imprisonment—the top of his guidelines range, like Atwood's.

In *United States v. Donald Hazard*, 21-cr-117 (RDM), Hazard pled guilty to a violation of 18 U.S.C. § 111(a)(1) and (b). As police attempted to hold back rioters from breaching the Capitol,

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Hazard grabbed an officer, pulled the officer down a set of concrete steps, and fell on top of another officer. Hazard then yelled and sprayed a chemical substance at officers on the Capitol's West Front. This Court sentenced Hazard to 57 months' incarceration. Atwood requires a higher sentence because his violent acts with weapons were far more extensive than Hazard's. Atwood went further than just spraying officers with a chemical spray, and a higher sentence at the top of Atwood's range is warranted.

In *United States v. Josiah Kenyon*, 21-cr-726 (CJN), Kenyon pled guilty to violations of 18 U.S.C. § 111(a)(1) and (b). On January 6, Kenyon joined other rioters who breached the U.S. Capitol and walked through the building. He used his fist and a flagpole to damage a large exterior window and he participated in assaulting police officers with a large and violent group of rioters at the Tunnel—during the same or similar timeframe as Atwood's assaults. There, like Atwood, Kenyon used several objects to violently assault officers attempting to the guard the tunnel entryway. Unlike Atwood, Kenyon presented a mitigating history of mental illness at sentencing. Judge Nichols ultimately sentenced Kenyon to 72 months' incarceration—reflecting Kenyon's higher criminal history category on the one hand, with the mitigating circumstances of Kenyon's personal history on the other.

As noted above, in *United States v. Jorden Mink*, 21-cr-25 (RDM), Mink pled guilty to violating 18 U.S.C. § 641 and §§ 111(a)(1) and (b). Mink and Atwood appear to have traveled to and left the Capitol together, and the two men engaged in similar conduct that day.[11] This Court sentenced Mink to 51 months' imprisonment. Atwood's case demands a higher sentence than Mink because his conduct was more extensive than that for which Mink was held accountable. *See, e.g.*, Exhibit 10 (depicting Mink moving aside and standing behind Atwood as Atwood hurls the metal

---

[11] Mink can be seen striking officers with a wooden pole while standing next to Atwood in Exhibit

pipe and speaker cabinet at officers around 5:03 p.m.). Moreover, Mink's PSR noted a more salient history of mental health and substance abuse issues.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[12] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Atwood must pay $2,000 in restitution, which reflects in part the role Atwood played in the riot on January 6.[13] Plea Agreement ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in

---

[12] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[13] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Atwood's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 128.

## VIII.  FINE

Atwood's convictions under 18 U.S.C. §§ 111(a)(1) and (b) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Nevertheless, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## IX.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 63 months' imprisonment (the top of the applicable guidelines range), 3 years' supervised release, $2,000 in restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Nathaniel K. Whitesel*
       NATHANIEL K. WHITESEL
       Assistant United States Attorney
       DC Bar No. 1601102
       601 D Street NW
       Washington, DC 20530
       nathaniel.whitesel@usdoj.gov
       (202) 252-7759